UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

VICTOR KENNARD BOONE-BEY,

                    Petitioner,

v.                                              Case No.  04-CV-74594-DT

DOUG VASBINDER,

                    Respondent.
_____/

**OPINION AND ORDER DENYING HABEAS CORPUS PETITION**

Petitioner Victor Kennard Boone-Bey has filed an application for the writ of

habeas corpus.  The habeas petition challenges Petitioner's state convictions for

manslaughter and firearm offenses.  The sole issue concerns the state court's finding

that a Confrontation Clause error was harmless.  Because the state court's conclusion

did not result in an objectively unreasonable decision, the habeas petition will be denied.


**I.  INTRODUCTION**

Petitioner was charged in Oakland County, Michigan with first-degree murder,

possession of a firearm by an ineligible person, and two counts of possession of a

firearm during the commission or attempt to commit a felony (felony firearm).  As

explained by the Michigan Court of Appeals, the charges arose from

> a fatal shooting at the victim's home in a dispute over a radio.  Defendant,
> Bobby Woolen (defendant's brother), D'Juan Yingling, and Robert Jones
> confronted the victim in the doorway of the home.  The victim was then
> shot, and the central issue at trial concerned the identification of the
> shooter; defendant asserting that Jones shot the victim, and the

> prosecutor arguing, of course, that defendant committed the killing.  The victim's young son, present in the home at the time of the shooting, identified defendant as the shooter, as did Jones.  Woolen, in a statement to police that was introduced to the jury after Woolen invoked the Fifth Amendment, claimed that defendant fired the gun.  Yingling and defendant testified that Jones was the shooter.

*People v. Boone-Bey*, No. 232924, at 1 (Mich. Ct. App. Mar. 13, 2003).  On January 23, 2001, the circuit court jury found Petitioner guilty of voluntary manslaughter, Mich Comp. Laws § 750.321, possession of a firearm by an ineligible person, Mich. Comp. Laws § 750.224f, and two counts of felony firearm, Mich. Comp. Laws § 750.227b. Petitioner was sentenced to two years in prison for the felony firearm conviction, following by concurrent terms of nineteen to sixty years in prison for the manslaughter conviction and six to twenty years in prison for the felon-in-possession conviction.

Petitioner raised his habeas claim and other issues in an appeal as of right. The Michigan Court of Appeals agreed with Petitioner that Bobby Woolen's statement to the police was erroneously admitted in evidence.  The court of appeals concluded, however, that the error was harmless.  The court of appeals affirmed Petitioner's convictions, *see id.*, and the Michigan Supreme Court denied leave to appeal on August 29, 2003.  *People v. Boone-Bey*, 668 N.W.2d 148 (2003) (table).

Petitioner filed his habeas corpus petition through counsel on November 23, 2004.  The sole issue reads:

> The admission of Bobby Woolen's out-of-court statement identifying Mr. Boone-Bey as the shooter violated Mr. Boone-Bey's constitutional right to confrontation.

Respondent argues in an answer to the habeas petition that Petitioner's claim lacks merit, because the state court did not unreasonably apply the facts and its decision was

2

neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

## II.  FACTUAL BACKGROUND

### A.  The Prosecution's Witnesses

Detective Maureen Merritt testified that, on September 12, 1999, she was dispatched to 12820 Oak Park Boulevard in Oak Park, Michigan where she interviewed the victim's young son, D'Juan Laye.  She claimed that the boy was hysterical and that she had to calm him down to acquire information.  D'Juan described the shooter as a black male, eighteen to twenty years old, 5'10" to 6' tall, and wearing a maroon or pinkish brown shirt, blue jeans, and a baseball cap.  D'Juan claimed that the shooter's brother, whom he knew from the neighborhood, handed a gun to the shooter.  D'Juan described a third suspect as a black male, light skinned, and wearing a white tank shirt.  D'Juan explained that his father had bought a radio, which did not work, and that his father wanted his $50 back.  *See* Tr. Jan. 2, 2001 at 133-52.

Police Officer Megan Townsend testified that she accompanied Detective Merritt to the crime scene and that upon arrival the victim was lying in the vestibule of the home.  Officer Townsend and paramedic Randy Van Wormer testified that the victim was pronounced dead at the hospital.  Dr. Bernadino Pacris testified that the victim died from gunshot wounds to the chest.  *See id.* at 153-160; Tr. Jan. 4, 2001 at 45-48; Tr. Jan. 9, 2001 at 18.

Evidence technician Robert Charlton testified that he found two fired cartridge casings from a semi-automatic gun on the front porch of the victim's home and a car stereo on the floor of the foyer.  There was one hole in the screen door, three holes in

3

the main door, and a hole in the wall opposite the foyer.  Charlton stated on cross-examination that fired cartridges do not necessarily land where a gun is discharged because they can bounce.  On redirect examination, Charlton testified that, if a person fired a semi-automatic gun outside, casings would not fly far and would fall to the ground.  *See* Tr. Jan. 4, 2001 at 2-44.

John Jacob testified as an expert on firearms.  He was given two fired cartridge cases and two bullets to examine, but no gun.  He claimed that the two cartridges were fired from the same gun, but he was unable to say whether the bullets were fired from the same weapon.  *See id.* at 49-67.

Cecilia Hibbit was the mother of Robert Hibbit, the victim.  She testified that, on September 12, 1999, her son Robert and Robert's son, D'Juan Laye, were watching television about 8:30 or 9:00 p.m.  She was resting when she heard shouting on the front porch.  Robert said, "You're disrespecting my mother's porch; please get off it." Another voice said, "I'll show you disrespect."  She also heard someone say, "Dog, you're hassling my friend."  She heard gunshots as Robert tried to close the front door and get his son out of the way.  Her son cried, "Help me, Mama; I've been hit."

According to Ms. Hibbit, the group was arguing about a radio that Robert bought from a younger person who needed the money.  From what Ms. Hibbit could determine, Robert and the young man had decided that, when the fellow got paid on Friday, he would give $50 to Robert.  She could not see the individuals, nor put a voice to a name. However, she said that, on the following day, her grandson (D'Juan Laye) identified Petitioner in a photograph as the person who shot his father.  Ms. Hibbit testified that D'Juan had been upset the previous night when his father was shot, but he was calm

4

enough to speak with the police. *See id.* at 67-92.

Bethany Smith testified that she went to Bobby Woolen's house on Scotia Street in Oak Park about 7:00 p.m. on September 12, 1999. Bobby Woolen, D'Juan Yingling, Gregg Mann, Albert Peppers, and Anthony Jackson were there. Petitioner and a friend of his came over in an Explorer Mountaineer truck and went in the house. Gregg Mann later got in the car that she had been driving. Bobby Woolen, D'Juan Yingling, Petitioner, and his friend came outside. Petitioner walked to the driver's side of the car in which Gregg Mann was seated and tapped on the window with a black gun. Petitioner said something to Gregg, who laughed. Then Petitioner, his friend, D'Juan Yingling, and Bobby Woolen got in the truck that Petitioner had arrived in and went toward Oak Park Boulevard. Bethany, Gregg Mann, Anthony Jackson, and Albert Peppers drove over to the house on Oak Park Boulevard where Petitioner and the other men had gone. From about ten or eleven houses away, Bethany saw four people hop out of a vehicle and go on the porch of a house. She could not see their faces. Four or five minutes later, she saw lights flash, and she heard popping like a gun. Then the four people who had been on the porch drove away. Bethany admitted that, at Petitioner's preliminary examination, she did not testify that Petitioner tapped a gun on the window of her car; she merely said that she saw Petitioner with a black object. She explained that she had been frightened that something would happen to her, to her mother, or to her home. She stated that she had received a telephone call from Petitioner after her testimony in district court. *See id.* at 94-150.

Gregg Mann testified that early on September 12, 1999, Robert Hibbit questioned

5

him about the radio that Bobby Woolen had sold to him.  Hibbit asked Mann whether

Woolen had his money.  Hibbit also said something about getting his boys together to

go and get Bobby.  Mann subsequently informed Woolen that Hibbit wanted his money.

Later on the same day, Petitioner came over to Bobby Wollen's house.      Mann denied

knowing what item Petitioner used to tap on the window of the car where Mann was

seated.  However, he admitted that Petitioner had said, "Come on."  He also admitted

that in his second statement to the police he wrote in his own handwriting that Petitioner

tapped on the window with the butt of a gun.  Mann claimed that he made that

statement because the police threatened to lock him up unless he wrote it.  *See* Tr. Jan.

8, 2001 at 126-62.

Anthony Jackson also testified that, in his statement to the police, he said that

Petitioner tapped on Greg Mann's car window with a gun.  On cross-examination,

Jackson claimed that the police told him the object was a gun and that his testimony

was pretty much worthless because he smoked marijuana every day and could not

remember what happened yesterday, let alone a year ago.  *See id.* at 162-89.

Robert Jones testified that he knew Petitioner as "Boone" or "Ken" and that he

rode with Petitioner to the house on Scotia Street in Oak Park on September 12, 1999.

They went in the house where he saw Petitioner's brother (Bobby Woolen) and a light-

skinned man that he did not know.  The four of them left the house, got in the

Mountaineer, drove around the corner, and stopped at a house.  Petitioner was driving.

Everybody got out of the Mountaineer and walked up to the porch.  A heavyset man

came to the door and a conversation ensued about a radio that was not functioning.

Everybody looked at the radio because the man said it did not work and he wanted his

6

money back.  They handed the radio back to the man, and  Bobby Woolen said that he would take care of it when he got paid.  The man in the house then said something like, "Get off my porch; don't come here disrespectful."  Then there was an argument between Petitioner and the man at the door.  Seconds later, Petitioner pulled out a gun and fired it three to five times at the man.  No one else fired any shots.  All four men subsequently got back in the truck and left the area.

On cross-examination, Jones testified that he was arrested for the murder, but was released on the following day.  He returned to the police station the next day and initially lied to the police.  The police led him to believe that someone had implicated him in the shooting, but they told him that they did not think he was the shooter, that he should not take the rap for Petitioner, and that there was no reason for him to go to prison for life and lose his family.  Although an arrest warrant was pending due to Jones' failure to pay child support, the police said that they would advise him of the warrant and not arrest him if he made a statement.  He went before a magistrate and made a sworn statement.  Then he was allowed to go home.  On re-direct examination, Jones testified that the police did not say that Petitioner had said he was the shooter.  *See id.* at 8-63.

D'Juan Laye testified that he was eight years old when his father was shot. D'Juan saw three men, including Petitioner, on the porch before the shooting.  Petitioner said to D'Juan's father, "I heard my brother sold you a radio that doesn't work.  He can't pay you until he gets his check on Friday."  After D'Juan's father said, "That's all that needs to be said," Petitioner and D'Juan's father started yelling.  When the yelling stopped, D'Juan's father said, "Get off my porch with all your yelling."  Petitioner asked

7

to see the radio, which was in his father's hand, and his father let Petitioner see it. When the radio was returned, Petitioner acquired a gun from his brother and shot D'Juan's father.

D'Juan testified that he could not remember how the three men were dressed, but he did say that Petitioner's brother was wearing a purple shirt and that the third man wore a tank top and jeans. On cross-examination, D'Juan admitted that, at Petitioner's preliminary examination he had testified that the gunshots occurred after his father closed the door and that he (D'Juan) did not see the man fire the gun. D'Juan explained at trial that Petitioner and no one else had the gun but he did not see Petitioner actually shoot the gun and he did not see whether the man behind him shot the gun. He was "guessing" that Petitioner did the shooting because Petitioner had the gun in his hand. *See id.* at 68-118.

Antoinette Smith testified that, after her daughter Bethany Smith testified at the preliminary examination, she and Bethany got telephone calls from a man named Kenny. The man did not threaten her or instruct her not to go to court, but the call made her afraid to have Bethany testify. *See id.* at 119-26.

James Edmonds was a detective at the time of the shooting. He testified that he canvassed the area and acquired some idea of who was involved in the shooting. Then he went to Bobby Woolen's house and found Bobby and D'Juan Yingling in the basement. On September 13, 1999, Edmonds assisted Detective Cooper in interviewing Gregg Mann. Edmonds testified that he did not force or threaten Mann to write something in his statement, and he thought that Mann was left alone with his stepfather to write out his statement. *See id.* at 197-206.

8

Detective Michael Barnard testified that D'Juan Laye described the shooter to him, but not the shooter's clothes. Although Petitioner was thirty-five years old on the date of the shooting, D'Juan described the shooter as twenty-two years old. D'Juan described the shooter's brother as wearing a maroon t-shirt, dark blue jeans, and a red baseball cap. D'Juan stated that the third individual wore a tank top and blue jeans. *Id.* at 206-17.

Sergeant Brett Hostutler testified that he compiled a photo array and asked D'Juan Laye on the day after the murder whether he recognized anyone in the photos. D'Juan immediately pointed to the picture of Petitioner and said that he was the man who shot his dad. D'Juan did not hesitate. *See id.* at 217-29.

Retired detective Ray Hinson testified similarly. He also testified that he tried to contact Petitioner through his mother, Sandra Heard, on the day after the murder. Ms. Heard paged Petitioner, who returned the call and told Hinson that he did not know anything about the shooting. *See* Tr. Jan. 9, 2001 at 25-36.

Police Officer Richard Robell testified that, when Petitioner was arrested on September 14, 1999, he had a key and a keyless remote device in his pocket. Both items fit the Mercury Mountaineer, which was parked nearby. *See id.* at 43-53.

Leykyria Snapp testified that Petitioner was wearing blue jogging pants and a blue t-shirt on September 12, 1999. She also claimed that Petitioner drove a truck at the time and was having problems with his pager. *See id.* at 54-62.

Sergeant James Rourke testified about his interviews with Bobby Woolen and Robert Jones. According to Sergeant Rourke, Bobby Woolen stated in the first

9

interview that he, D'Juan Yingling, his brother, and an unknown male went to Robert Hibbit's home and that the unknown male shot Hibbit. During the second interview, Sergeant Rourke informed Woolen that Hibbit's son had identified Petitioner as the shooter. Upon hearing this, Woolen started to cry and said that he did not think it was right that his brother killed the man in front of his little boy. Woolen informed Sergeant Rouke that Petitioner had suggested going to Hibbit's home to talk with Hibbit about the radio in dispute. At Hibbit's home, Petitioner got into an argument with Hibbit and told Hibbit to leave his brother alone. Hibbit had laughed at Petitioner and ordered him to get off his property. Petitioner then pulled a gun out of his waistband and shot Hibbit three or four times. Woolen explained to Sergeant Rouke that he lied during his first statement to the police because he was afraid of his brother and because he cared about his brother and did not want to tell the police that his brother killed somebody.

Sergeant Rouke testified that Robert Jones was arrested for murder and, at first, denied being present at the shooting. After being told that D'Juan Yingling and Bobby Woolen had implicated Jones, Jones made an oral statement that Petitioner was the shooter. Sergeant Rourke informed the magistrate before whom Jones made his oral statement that the only promise to Jones was that he would be released after he made his statement. *See id.* at 63-96.

Sergeant Steve Cooper testified that D'Juan Laye identified Bobby Woolen's photograph and said that Woolen's brother shot his father. Sergeant Cooper denied threatening or forcing Gregg Mann to make a statement or write that Petitioner tapped a car window with a gun before leaving Woolen's house for the victim's home. *See id.* at 97-124.

10

### B. Defense Witnesses

Ethan Euseary, Stacey Nugent, and Robert Old testified that they saw two to four people and flashes of light on Oak Park Boulevard at about 9:00 p.m. on September 12, 1999. They also heard a noise like firecrackers. John Forman and his daughter Be-Lon Forman were sitting in a car on Morten Street at about the same time. After hearing gunshots, they saw a vehicle drive by without its lights on. John Scarpone was walking his dog on Oak Park Boulevard when he noticed a group of people on a porch facing a large man, who was standing by the front door. He heard arguing and saw about five gunshots come from the same gun. Then he saw the men run off the porch to a vehicle. *See id.* at 126-30; Tr. Jan. 11, 2001 at 2-28 and 59-67.

John Catchings, a paralegal who worked for the attorney that represented Bobby Woolen, testified that Woolen informed him that Robert Jones did the shooting. Woolen explained to Catchings that he previously implicated Petitioner in the shooting because the police told him that they knew Petitioner did the shooting and that Woolen could be charged if he did not make a statement. *See* Tr. Jan. 11, 2001 at 29-44.

Steven Foreman testified that, about two weeks after the shooting, Robert Jones informed him that he (Jones) fired a gun after the victim reached for something on his side and said, "You're not going to come to my house and talk to me like this." Jones admitted to Foreman that the victim did not have a gun in his possession. Foreman testified that he did not inform the police what Jones said because Jones was threatening people, and he thought that Jones would shoot up his house or do something else. *See id.* at 68-89.

Petitioner testified that, after his brother asked him to talk to a man about a radio

11

and about the money that his brother owed the man, Petitioner tapped his finger on the car window where Gregg Mann was seated.  The gesture meant "What's up? See you later."  At Hibbit's house, Petitioner assured Hibbit that Bobby Woolen would pay Hibbit on Friday when he got paid.  Robert Jones and Hibbit exchanged innuendos after Jones stated that the radio did not seem broken to him.  Then Jones, who was standing at the bottom of the steps to the porch, fired a gun.

Petitioner stated that he was wearing blue sweat pants and a blue sweatshirt, but no hat, on the night of the shooting and that Robert Jones drove the Mountaineer.  Petitioner denied shooting Robert Hibbit.  He also denied possessing a gun or knowing that anyone else was carrying a gun on the night in question.  He stated that he did not try to intimidate Bethany Smith and that he did not discuss the case with Detective Hinson because Jones threatened to hurt Petitioner's brother, mother, children, and other people if Jones went to jail.  *See id.* at 89-173.

D'Juan Yingling testified that Robert Jones and Robert Hibbit argued about the radio on Hibbit's porch and that Hibbit instructed Jones not to come over to his house and check on him.  Then Jones pulled out his gun and started shooting at Hibbit.  *See* Tr. Jan. 16, 2001 at 17-54.

## C.  Rebuttal Witnesses

Sergeant James Rourke testified on rebuttal that D'Juan Yingling informed him that it was Petitioner's idea to go to Hibbit's house and that Petitioner had argued with Hibbit before the shooting.  Yingling also told Sergeant Rouke that, after the shooting, Petitioner instructed him to keep his mouth shut and say that he did not know anything if he was questioned by the police.  *See id.* at 55-64.

Sergeant Steven Cooper testified that, after Petitioner was advised of his constitutional rights, he refused to make a statement and did not say that Robert Jones shot Hibbit.  Cooper also testified that Steven Foreman's statement about Robert Jones' admission to Foreman was deemed unreliable after Foreman went to the state police. *See id.* at 67-74.

## III.  STANDARD

Petitioner is entitled to the writ of habeas corpus if he can show that the state court's adjudication of his claim on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362,

13

412-13 (2000).  A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Id.* at 410 (emphasis in original).  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.* at 409. "Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence."  *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)), *cert. denied*, 544 U.S. 931 (2005).

## IV.  DISCUSSION

Petitioner contests the admission of Bobby Woolen's statement in evidence.  The content of the statement was admitted at trial through the testimony of Detective Sergeant James Rourke.  Petitioner claims that the admission of Woolen's statement violated his right to confront witnesses because Woolen did not testify at trial.

As previously explained, Woolen admitted to the police that he was present at the shooting and that Petitioner pulled a gun from the back of his waistband and shot Robert Hibbit three or four times.  The prosecutor moved to admit Woolen's statement under the catch-all exception to the hearsay rule.[1]  The trial court ruled that Hibbit's

---

[1] At the time, the exception read:

comments to the police were admissible because the statements were fairly contemporaneous with the shooting and because Woolen was not biased, nor strongly motivated to lie, to implicate Petitioner, or to exonerate himself.

The Michigan Court of Appeals determined that the trial court erroneously admitted Woolen's statement in evidence. The court of appeals questioned the trustworthiness of Woolen's statements and concluded that Woolen's statements lacked the indicia of reliability required for a hearsay statement to be admitted under the catch-all exception to the hearsay rule. The court of appeals nevertheless determined that admission of the evidence was harmless beyond a reasonable doubt.

## A. The Right to Confront Witnesses

"The Sixth Amendment guarantees to a criminal defendant the right 'to be confronted with the witnesses against him.'" *Danner v. Motley*, 448 F.3d 372, 377 (6th Cir. 2006) (quoting U.S. Const. amend. VI). The Amendment applies to state court proceedings, *Pointer v. Texas*, 380 U.S. 400, 403 (1965), and it provides a criminal

---

(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(6) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions [to the hearsay rule] but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact, (B) the statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts, and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Mich. R. Evid. 804(b)(6). Rule 804 subsequently was amended. The catch-all exception to the hearsay rule is now Michigan Rule of Evidence 804(b)(7).

defendant with "the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).

Petitioner was unable to confront Bobby Woolen at trial because Woolen chose to invoke his Fifth Amendment right to remain silent and, therefore, was unavailable to testify. The parties do not dispute Woolen's unavailability. Nor is it disputed that Woolen's statement to Sergeant Rourke was hearsay.[2]

Furthermore, this court agrees with the state court of appeals that Woolen's statement was not admissible. At the time, hearsay statements were admissible only if the declarant was unavailable and his or her statement bore "adequate 'indicia of reliability.'" *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).[3] Reliability can be inferred when "the evidence falls within a firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." *Id.*[4]

An accomplice's confession that inculpates a criminal defendant does not fall

---

[2] In Michigan, hearsay is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Mich. R. Evid. 801(c).

[3] *Roberts* has been abrogated in part by *Crawford v. Washington*, 541 U.S. 36 (2004). The court need not determine whether Petitioner's statements were admissible under *Crawford*, because *Crawford* was decided after Petitioner's conviction became final, and it does not apply retroactively on habeas review. *Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir. 2005).

[4] The Michigan Court of Appeals did not cite *Roberts* in its *per curiam* opinion. However, it stated that Petitioner's claim implicated the Confrontation Clauses of the state and federal constitutions. In addition, the court of appeals relied on the language used by the Supreme Court in *Roberts,* and it framed the issue in terms of the admissibility of hearsay under the Sixth Amendment. There can be no doubt that the court of appeals adjudicated Petitioner's constitutional claim, as opposed to merely addressing a state law claim under the Michigan Rules of Evidence.

16

within a firmly rooted exception to the hearsay rule.  *Lilly v. Virginia*, 527 U.S. 116, 134 (1999).  Nor is the residual hearsay exception a firmly rooted hearsay exception for purposes of the Confrontation Clause.  *Idaho v. Wright*, 497 U.S. 805, 817-18 (1990); *Hill v. Brigano*, 199 F.3d 833, 846 (6th Cir. 1999).  Therefore, Bobby Woolen's statement was admissible only if it bore particularized guarantees of trustworthiness.

"'[P]articularized guarantees of trustworthiness' must be shown from the totality of the circumstances," including "those [circumstances] that surround the making of the statement and that render the declarant particularly worthy of belief."  *Wright,* 497 U.S. at 819.  "[I]f the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial."  *Id.* at 820.

The Michigan Court of Appeals determined that Bobby Woolen's statement to Sergeant Rourke did not bear particularized guarantees of trustworthiness for the following reasons:

> First, Woolen's statements were not spontaneous, but rather, were made in response to an interrogation at the police station.  Second, Woolen initially informed Rourke that an unknown black male was the person that shot the victim, but later changed his story and indicated it was defendant that shot the victim after Rourke informed Woolen that the victim's son identified defendant as the shooter. Woolen later informed a paralegal for an attorney representing him, that the person who shot the victim was [Robert] Jones.  Woolen informed the paralegal that he gave the police three different versions of what happened on the night of the incident. Thus, it is apparent that Woolen's story lacked consistency.  Third, Woolen clearly had a motive to fabricate and did not demonstrate a lack of bias. The victim's son testified that Woolen handed defendant the weapon used to kill the victim; however, Woolen informed Rourke that he never handed defendant a gun.  Thus, it would appear as though Woolen could have been implicated in the shooting and that he attempted to avoid responsibility for the shooting.  Fourth, Woolen utilized his Fifth Amendment right to avoid testifying at defendant's trial. This lends

17

additional support for the theory that Woolen may have attempted to avoid responsibility as an accomplice in this case. Although Rourke indicated that he had not spoken with the victim's son regarding Woolen handing defendant the gun, Rourke admitted that he may have told Woolen that it was in his best interest to speak with him. Fifth, it appeared that Woolen's statements were not necessarily voluntary. Woolen was interrogated at approximately 3:00 a.m. following the shooting. It was only after Rourke informed Woolen that the victim's son identified defendant as the offender that Woolen allegedly implicated defendant. Sixth, testimony revealed that Woolen would have had personal knowledge of the incident, which supports the admission of the testimony as Woolen was an eyewitness to the shooting. Seventh, the statements were made to a police officer. The trial court acknowledged that this factor weighed heavily against the admission of Woolen' statements. Finally, the statements were given the day afer the incident, which is relatively soon after the incident took place.

*Boone-Bey*, Mich. Ct. App. No. 232924, at 2-3.

Given the circumstances of Woolen's statement (interrogation by the police at the police station) and the substance of his statement (inculpating Petitioner and limiting his involvement in the crime), Woolen's statement to Sergeant Rourke did not bear particularized guarantees of trustworthiness. Because the statement also did not fall within a firmly rooted exception to the hearsay rule, the statement lacked adequate indicia of reliability. Its admission at trial violated Petitioner's constitutional right to confront Woolen.

**B. Harmless Error**

The Michigan Court of Appeals concluded that, although Bobby Woolen's statements to Sergeant Rourke were erroneously admitted in evidence, the error was harmless beyond a reasonable doubt. Confrontation Clause errors are subject to harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). "When a state court addresses a harmless-error claim on direct review, the clearly established federal law that it must apply is the *Chapman* standard." *Eddleman v. McKee*, __ F.3d

18

__, __, No. 05-1493, 2006 WL 3627200, at *5 (6th Cir. Dec. 14, 2006).  In *Chapman v. California,* 386 U.S. 18 (1967), the Supreme Court held that, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."  *Id.* at 24.

On federal habeas review of a state court's finding of harmless error, the appropriate standard of review is the *Chapman* standard plus the deference owed state courts under 28 U.S.C. § 2254(d).  *Eddleman*, 2006 WL 3627200, at *6, *8.  "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt."  *Van Arsdall*, 475 U.S. at 684.  Whether an error is harmless depends on a host of factors, including

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.*  Federal courts may not grant habeas corpus relief merely because "the state court . . . erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner."  *Mitchell v. Esparza*, 540 U.S. 12, 18  (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-77 (2003)).

### 1.  The State Court's Decision

The Michigan Court of Appeals found the Confrontation Clause error harmless because

> the victim's son testified regarding his eyewitness account of what

happened at the time of the shooting. He identified defendant as the person who shot the victim in a police photographic array and in a photograph presented at trial, and he also made an in-court identification of defendant. Further, Robert Jones testified that defendant was the person that shot the victim. Although there may be argument as to whether Jones had a motive to testify in the way that he did, no such argument may be made regarding the victim's son. It would appear that the only eyewitness without a motive to fabricate was the victim's son. Moreover, defendant was seen with a gun prior to the shooting, he was the individual that did most of the talking with the victim, and shell casings were found on the porch near where defendant was standing.

*Boone-Bey*, Mich. Ct. App. No. 232924, at 4.

## 2. Analysis

Bobby Woolen's statement to the police undoubtedly was valuable in proving the prosecution's case. The prosecutor relied on Woolen's statement, which included the only evidence that the victim laughed at Petitioner before the shooting. However, the prosecutor did not suggest that the victim's laughter was the only motive for the shooting. The prosecutor argued that the murder occurred because of a radio that did not work, because Petitioner needed to show that he was a tough man and a hero, who intended to bail out his younger brother, and because Hibbit said, "Don't be disrespecting my mother's property and crackin' on me on my own property." Tr. Jan. 16, 2001 at 86-89.

Woolen's statement was not essential to the prosecution's case. *Cf. Dorcy,* 398 F.3d at 791 (concluding that admission of a missing witness' statement was not harmless where it was the only eyewitness account heard by the jury besides another improperly admitted statement). The statement was not necessary to establish an element of the offense, *cf. Hill v. Hofbauer*, 337 F.3d 706, 718-20 (6th Cir. 2003) (finding that a Sixth Amendment error was not harmless where the inadmissible evidence

20

removed any doubt that the defendant possessed the requisite malice for second-degree murder), and the prosecution's case was strong without the statement. *Cf. Stapleton v. Wolfe*, 288 F.3d 863, 868 (6th Cir. 2002) (pointing out that the prosecutor's case was not strong without an accomplice's out-of-court statement).    The prosecutor relied on Robert Jones's testimony, the repeated identifications of Petitioner made by D'Juan Laye, who was not an accomplice, and the testimony of other witnesses who saw Petitioner with a gun before the shooting and testified that Petitioner drove to and from the victim's home and argued with the victim.  The following discussion explains in more detail why the admission of Bobby Woolen's statement in evidence can be construed in an objectively reasonable manner as harmless beyond a reasonable doubt.

### a.  Robert Jones and D'Juan Laye's Testimony

Evidence is not harmless when it bolsters the only direct account of the petitioner's involvement in the crime and connects him to the only physical evidence in the government's case. *Fulcher v. Motley*, 444 F.3d 791, 811 (6th Cir. 2006).  Bobby Woolen's statement was not the only direct account of Petitioner's involvement in the crime.  Both Robert Jones and D'Juan Laye testified that Petitioner shot Hibbit.  *See* Tr. Jan. 8, 2001 at 21-22 (Robert Jones's testimony); *id.* at 77 (D'Juan Laye's testimony). Robert Jones's testimony was somewhat suspect because he initially was arrested for the murder, had served time in prison, and did not want to return to prison.  However, he was thoroughly questioned on cross-examination about being arrested for murder, about his initial lies to the police, and about being released after making a statement. *See id.* at  30, 32, 41, and 51.

21

Even if the jury found Jones to be incredible, D'Juan Laye did not know Petitioner, *id.* at 101, and he had no motive for accusing him. Defense counsel even conceded that D'Juan had nothing to gain from testifying against Petitioner. *See* Tr. Jan. 2, 2001 at 132.

Admittedly, there were problems with D'Juan Laye's testimony. He informed a detective at the scene that the shooter was eighteen to twenty years old and that he wore a maroon or pinkish brown shirt, blue jeans, and a baseball cap. Tr. Jan. 2, 2001 at 144. D'Juan subsequently described the shooter's *brother* the same way. *See* Tr. Jan. 8, 2001 at 210. Moreover, Petitioner was thirty-five years of age at the time of the shooting. *See* Tr. Jan. 11, 2001 at 154.

D'Juan, however, was only eight years old at the time of the shooting, and he did not waver from his testimony that Petitioner was holding the gun immediately before the shooting and that Petitioner shot his father. *Id.* at 77, 110, and 113. In addition, he did not hesitate when identifying Petitioner's photograph after the murder.

### b. Physical Evidence

The physical evidence supported Robert Jones and D'Juan Laye's testimony that Petitioner was the shooter. Two fired cartridge cases were found on the victim's porch near where Petitioner admittedly had been standing. *See* Tr. Jan. 4, 2001 at 8. Witnesses, including Petitioner and D'Juan Yingling, placed Robert Jones at the bottom of the steps leading to the porch. *See* Tr. Jan. 11, 2001 at 106, 110, 141, and 147 (Petitioner's testimony); Tr. Jan. 16, 2001 at 29 (D'Juan Yingling's testimony). And an evidence technician opined that casings from a semi-automatic would fall to the ground and not fly far. *See* Tr. Jan. 4, 2001 at 42.

22

### c.  Other Considerations

There was other evidence implicating Petitioner.  Bethany Smith testified that, before Petitioner and others went to the victim's home, Petitioner tapped a gun on the window of the car in which Gregg Mann was seated.  *See* Jan. 4, 2001 at 104.   Gregg Mann and Anthony Jackson made the same comment in written statements to the police.  *See* Tr. Jan. 8, 2001 at 141 (Gregg Mann's statement); *id.* at 169-70 (Anthony Jackson's statement).  Although D'Juan Yingling testified that Robert Jones argued with the victim, *see* Tr. Jan. 13, 2001 at 28, both Robert Jones and D'Juan Laye testified that it was Petitioner who argued with the victim before the shooting.  *See* Tr. Jan. 8, 2001 at 21 (Robert Jones's testimony); *id.* at 75 (D'Juan Laye's testimony).

Still another consideration is the fact that the trial court instructed the jurors on how to evaluate Bobby Woolen's statement to the police.  The court charged the jurors to examine the statement carefully if they concluded that Woolen was an accomplice.  The lengthy cautionary jury instruction on accomplice statements, *see* Tr. Jan. 16, 2001 at 150-52, may have minimized the impact of Woolen's statement in the jurors' minds.  Juries are presumed to follow the instructions of the trial court.  *See e.g. United States v. Campbell*, 317 F.3d 597, 607 (6th Cir. 2003).

### d.  Defense Witnesses

Not only was the prosecution's case strong, but the defense case had serious limitations.  Petitioner's testimony was not entirely credible because he denied hearing an argument or a conversation about disrespecting someone, *see* Tr. Jan. 11, 2001 at 144 and 150, even though other witnesses claimed to hear an argument and a heated conversation about disrespecting someone and getting off the property.

23

D'Juan Yingling's testimony could have been considered biased in that he was a friend of both Petitioner and Bobby Woolen, but he did not know Robert Jones. *See* Tr. Jan. 16, 2001 at 18-19. Moreover, the jury learned that Petitioner called Yingling on the night of the shooting and instructed him to keep his mouth shut and say that he did not know anything if the police questioned him. *See id.* at 58-59.

Steven Foreman admitted that he was a friend of Petitioner and that he did not like Robert Jones. *See* Tr. Jan. 11, 2001 at 72-73. In addition, the police determined that the information Steven Foreman provided (that Robert Jones admitted to being the shooter) was not reliable. *See* Tr. Jan. 16, 2001 at 73-74.

## V. CONCLUSION

This court need not determine in the first instance whether the admission of Bobby Woolen's comments to Sergeant Rourke was harmless beyond a reasonable doubt, but rather evaluate that decision as announced by the state court. Even if this court might think it would have reached a different conclusion on the same facts, the state court's conclusion is to be affirmed so long as it was within the range of reasonable outcomes, i.e., so long as it was not objectively unreasonable. *Mitchell,* 540 U.S. at 18.

The identity of the shooter was a heavily contested issue, but Bobby Woolen's statement to the police was not *essential* to the prosecution's theory of the case, and there was other evidence, including physical artifacts, that can easily be viewed as corroborating Woolen's statement on material points. Given the relative strength of the prosecution's case and the several weaknesses in the defense presentation, the state court's conclusion of harmlessness of the Confrontation Clause error was not

24

objectively unreasonable. Although the case presents a close call, in light of the

deference owed to state courts, this court concludes that the decision of the Michigan

Court Appeals did not result in an unreasonable application of *Chapman*.  Petitioner's

application for the writ of habeas corpus is DENIED.


                                   S/Robert H. Cleland
                                   ROBERT H. CLELAND
                                   UNITED STATES DISTRICT JUDGE


Dated:  January 22, 2007


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, January 22, 2007, by electronic and/or ordinary mail.


                                   S/Lisa Wagner
                                   Case Manager and Deputy Clerk
                                   (313) 234-5522